Willie L. DAVIS, Plaintiff,

v.

UNITED STATES of America and the M/V BELLATRIX, Defendants.

No. CV 492–199.

United States District Court, S.D. Georgia, Savannah Division.

July 19, 1993.

Eugene C. Brooks, IV, Savannah, GA, Richard P. Salloum, Gulfport, MS, for plaintiff.

Robert S. Glenn, Jr., and Theresa F. Pindar, Jay D. Gardner, Asst. U.S. Atty., Savannah, GA, for defendants.

## ORDER AND MEMORANDUM

NANGLE, District Judge.

Currently before the Court is defendant United States of America's Motion for Summary Judgment. For the reasons described below, the United States' motion will be granted.

### FACTS

On August 13, 1990, plaintiff Willie L. Davis was accidentally injured while employed by Southeastern Atlantic Cargo Operators (SEACO), a stevedoring company, as a longshoreman aboard the M/V BELLA-

TRIX. The United States (through the Department of the Navy) owns the BELLA-TRIX, a "roll on, roll off" vessel. A "RO–RO" vessel is "the floating equivalent of a multi-level parking garage, with the decks of the vessel corresponding to the floors of the garage." *Lagana v. Toyofuki Kaiun, K.K.*, 1991 A.M.C. 2397, 2398, 1991 WL 33356 (S.D.N.Y.1991). The BELLATRIX served as a carrier of military cargo which was rolled and driven onto it. The BELLATRIX was originally a container vessel when purchased in 1982, but the United States converted her into a RO–RO vessel in 1984.[1]

To convert the BELLATRIX into a RO–RO vessel, the United States added ramps and watertight doors. The ramps connecting the vessel's decks are fifty feet long and have a design incline of twelve degrees. The door assembly is described by its manufacturer as follows:

> The door assembly consists of a steel door panel measuring thirteen feet in height and eighteen feet in width, which is connected by steel hinges to a steel door frame. The base of the door frame consists of a steel bar sill which measures two and one-half inches in height ... The door assembly was designed and manufactured to be watertight, and ... [t]he steel bar sill serves to preserve the watertight integrity of the door.

Aff. of A.L. Bunch, attached as Ex. B to Def.'s Supp. to Reply Br. During cargo operations, the exposed sill is protected with a metal plate. This type of door is present at the bottom of the ramp connecting the C and D decks.

At the time of the accident at issue, Davis was operating a forklift owned by SEACO and gathering lashing gear collected by fellow longshoremen. A pallet rested on the forklift's blades, and other members of the lashing gang placed gear from the deck onto the pallet. After completing work on the C deck, Davis drove the forklift in reverse down the ramp connecting the C deck with the D deck. According to Davis, his forklift's brakes failed as he traveled down the ramp, and the forklift hit the raised sill at the end

of the ramp. The resulting jolt caused the two thousand pound counterweight to fall off the forklift. Davis' head hit the forklift's overhead "headache rack," and he eventually required surgery to repair a herniated disk.

Davis filed the instant action pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA). *See* 33 U.S.C. § 905(b). Since the BELLATRIX is owned by the United States, this Court has jurisdiction under the Suits in Admiralty Act, 46 U.S.C.App. §§ 741 *et seq.*, and the Public Vessels Act, 46 U.S.C.App. §§ 781 *et seq.*

## DISCUSSION

The United States' Motion for Summary Judgment counters Davis' contentions in his original and amended complaints that the forklift's brakes overheated and that the brakes slipped due to the steepness of the ramp. Davis' response does not specifically address these arguments. Instead, it alleges that the United States provided him an unsafe workplace by placing a raised sill and metal plate at the end of the BELLATRIX' ramp. Davis also identifies as an issue whether the BELLATRIX was properly designed and modified for use as a RO–RO vessel. *See* Pl.'s Statement of Material Facts for Which There Are Genuine Issues to Be Tried. To fully determine the applicability of summary judgment, all of these arguments will be discussed.

Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The evidence and any inferences which may be drawn from it should be viewed in the light most favorable to the nonmovant. *Mercantile Bank & Trust Co., Ltd. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985). The party seeking summary judgment must first identify grounds which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265

---

1. Details of the conversion are contained in the exhibits attached to Davis' Motion to File Exhib-

its Out of Time. Accordingly, that motion is granted.

(1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that there is a genuine issue of material fact. *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566 (11th Cir.1991); *see also United States v. Gilbert*, 920 F.2d 878 (11th Cir. 1991). A mere scintilla of evidence supporting the nonmovant's position will not suffice, however. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

▆▆▆ The Supreme Court defined a ship owner's duties to stevedores and longshoremen at various stages in cargo operations in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). First, before the vessel is turned over to the longshoremen, a vessel owner must have "the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Id.* at 166–167, 101 S.Ct. at 1622. Second, prior to cargo operations, the owner must warn the stevedore of any hazards of which the owner knows or should know that would likely be encountered by the stevedore in the course of his operations and which are not obvious to or anticipated by the stevedore.[2] *Id.* Third, a vessel may be liable to an injured longshoreman if it is actively involved in cargo operations and fails to exercise due care to avoid exposing the longshoreman to harm. *Id.* at 167, 101 S.Ct. at 1622. Finally, if a stevedore's judgment is "obviously improvident" and the ship owner knew of a defect presenting an unreasonable risk of harm, the ship owner may have a duty to intervene and repair the unsafe condition. *Id.* at 175, 101 S.Ct. at 1626. A ship owner has no general duty to inspect or supervise to discover dangerous conditions that develop within the confines of cargo operations assigned to the stevedore, *Id.* at 172, 101 S.Ct. at 1624–25, and may rely on the stevedore to avoid exposing the longshoremen to unreasonable harm. *Id.* at 170, 101 S.Ct. at 1623–24.

## A. The United States owed no duty to Davis with regard to the forklift's brakes.

▆▆▆ Davis claims that the forklift's brakes overheated, causing him to lose control of the forklift on its descent. Summary judgment in favor of the United States is appropriate on the issue of overheating brakes for several reasons. First, SEACO owned the forklift. Under *Scindia*, the forklift was not part of the BELLATRIX' equipment which the United States was required to turn over to the stevedore "in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Id.* at 166–167, 101 S.Ct. at 1622. Second, there is no evidence that the United States was actively involved in cargo operations to the extent that it would have to intervene if a brake failure were known. *See Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622.

Finally, all evidence bolsters the conclusion that no one—including the stevedore—knew of the allegedly faulty brakes on the forklift driven by Davis. Michael Sheehan, the stevedore foreman, testified that after the accident, Davis did not tell him that the brakes had failed. Sheehan Dep., p. 21, attached as Ex. E to Def.'s Mot. for Summ. J. If Davis had reported a failure, Sheehan would have called the mechanics to check out the problem. Sheehan Dep., p. 19, attached as Ex. E to Pl.'s Resp. After the accident, the longshoremen continued to operate the forklift used by Davis without any problems. Sheehan Dep., p. 21, attached as Ex. E to Def.'s Mot. for Summ. J. Similarly, Richard McPherson, the lashing crew foreman, testified that he had heard of no forklift operator experiencing a brake failure on the BELLATRIX. McPherson Dep., p. 73, attached as

---

**2.** The first and second duties are referred to as, respectively, the ship owner's turnover duty and the turnover duty to warn.

Ex. F to Def.'s Mot. for Summ.J.[3] A SEACO employee responsible for maintenance of SEACO's forklifts stated that he had no knowledge of any problems involving brakes slipping while going down a ramp, and concluded that such an event would be "unusual" because longshoremen do not normally call with such a complaint. Knight Dep., p. 24, attached as Ex. S to Def.'s Mot. for Summ. J. Since the United States (or any other party) did not know that the forklift had defective brakes, the stevedore's use of the forklift was not "obviously improvident," and the United States had no duty to intervene.

Given the facts that SEACO owned the forklift, the United States was not actively involved in cargo operations, and the United States and SEACO had no knowledge of the allegedly defective brakes, the United States owed no duty to Davis under the *Scindia* standard. Accordingly, summary judgment in favor of the United States is appropriate on Davis' argument that his forklift's brakes failed.

**B.** *Davis did not present sufficient evidence on the steepness of the ramp to survive summary judgment.*

█ Davis presented evidence only that the BELLATRIX' ramp was the steepest ramp that he had encountered. Davis Dep., p. 39, attached as Ex. C to Pl.'s Resp. His response to the United States' motion apparently abandons any argument that the steepness of the ramp caused the brakes to fail. For example, Davis states that "the brakes either failed to hold or the forklift built up too much speed for the brakes to hold it." Pl.'s Resp., p. 2. He later argues that "[i]f, for whatever reason, the speed builds up too much," the forklift may hit the raised sill. *Id.* at p. 10.

Summary judgment on an issue is appropriate where an adverse party does not re-

spond with evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Since Davis' assertion that this ramp was the steepest that he had encountered does not sufficiently set forth facts showing a genuine issue for trial, summary judgment on this ground is appropriate.[4]

**C.** *The United States did not breach its duty to provide Davis with a reasonably safe workplace by placing raised sills on the end of the ramp.*

Davis next argues that the United States failed to provide him with a reasonably safe workplace since it was foreseeable that a forklift might lose its brakes, career down the ramp, and hit the raised sill. Under Davis' theory, the United States breached its turnover duty. The United States counters that Davis never offers proof that the door sill was a hazard and that his assertion attempts to introduce the warranty of seaworthiness into the case. The United States' assertions are correct.

**1.** **Davis has submitted no proof indicating that the raised sill is a hazard.**

█ Davis argues that "[t]he speed bump was a hazard because it was foreseeable that vehicles going down the interior ramp would bounce over this speed bump if their brakes heated up or simply if the vehicle was going too fast." Pl.'s Resp., p. 9. Davis testified that if the raised sill were not present, his forklift would have rolled onto the next deck rather than jolting him into the headache rack. Davis Dep., p. 79, attached as Ex. M to Def.'s Mot. for Summ. J. Davis also submitted his affidavit and an identical affidavit from McPherson claiming that all other RO–RO vessels lacked the raised sills found on the BELLATRIX. *See* Davis Aff. ¶ 7, at-

---

**3.** McPherson hypothesized that the brakes could slip because "sometimes you would be riding on a lift or whatever and going up or downhill, the brakes could crystallize or whatever you want to call it, and you don't have brakes because you hold the brakes too much, you heat them up and this would come ... you could have perfect brakes until it gets to this point, then you hold the pressure on it too long, because of the incline

..." McPherson Dep., pp. 17–18, attached as Ex. D. to Pl.'s Resp. Although McPherson testified in this manner, he never testified that he knew of brake problems on the BELLATRIX.

**4.** Alternatively, the discussion relating to design defect of the raised sill applies.

tached as Ex. F to Pl.'s Resp.; McPherson Aff. ¶ 7, attached as Ex. I to Pl.'s Resp.

Davis' accident occurred only due to the combination of his forklift's overheating brakes and the raised sill. *Terry v. M/S BIRTE RITSCHER KG*, 1992 A.M.C. 2199 (D.N.J.), *aff'd without opinion*, 952 F.2d 1393 (3d Cir.1991), addressed a similar situation. In *Terry*, the vessel's two hydraulic cranes lowered containers from a barge onto the vessel. As the cranes released the containers, the . ship would rapidly rock to right itself. The longshoreman plaintiff, who had to guide containers with his hands, had one hand crushed as he guided a container. The Court granted summary judgment to the vessel despite plaintiff's argument that the vessel breached its turnover duty.

The Court addressed plaintiff's allegations that the instability of the ship, coupled with the absence of stabilizing devices on the hydraulic cranes, rendered the vessel unsafe for cargo operations. Although stabilizing devices may have made the cranes safer, the lack of stabilizing devices did not prove that the cranes were in a defective or unsafe condition without them. *Id.* at 2204. Additionally, there was no evidence that the accident would not have occurred if the stabilizing devices had been installed. *Id.* Thus, "[t]he alleged dangerous condition is not the result of a defect or unsafe condition of the vessel but is the result of a combination of factors," including the lack of stabilizing devices, the operation of both cranes simultaneously, the floating barges, and the need for the stevedore to stabilize the containers with his hands. *Id.* at 2205. The condition came into existence only during cargo operations, moving plaintiff's claim outside of the turnover duty. *Id.*

As in *Terry*, the exact combination of factors resulting in plaintiff's injury came into existence only after the vessel had been turned over to the stevedore. The allegedly dangerous condition resulted from the combination of the raised sill and the SEACO forklift's failing brakes. As noted in the preceding discussion, the United States owed no duty to Davis with regard to the forklift's brakes.

Although the raised sill was in existence prior to cargo operations, Davis has presented no evidence that the design of the sill itself was hazardous. Davis only submitted affidavits stating that the sill was unlike the door assembly on "all other RO–RO vessels." This evidence is insufficient to show that the raised sill was a hazard. First, the Court doubts that the affiants have seen all other RO–RO vessels, as demonstrated by the door manufacturer's testimony that this sill design had been installed on vessels other than the BELLATRIX. More importantly, the evidence that the assembly was different does not necessarily lead to the conclusion that it was hazardous.[5]

The United States did not breach its turnover duty. *Scindia* requires only that a vessel owner have "the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Scindia*, 451 U.S. at 166–167, 101 S.Ct. at 1622. The United States presented the BELLATRIX in such a condition, and SEACO could carry on its cargo operations with reasonable safety. The United States is not responsible for the brake failure on the SEACO forklift driven by plaintiff; if the forklift had operated and stopped normally, it appears that this unfortunate accident would not have occurred.

**2. Alternatively, Davis' claim goes to unseaworthiness, which is not actionable under the LHWCA.**

■ To determine whether the United States provided him with an unsafe work place, Davis states that this Court must determine whether the United States properly modified the BELLATRIX into a RO–RO vessel during a 1984 conversion. This modification argument involves unseaworthiness, which is not actionable under the LHWCA.

---

**5.** *Compare Martinez v. Korea Shipping Corp., Ltd.*, 903 F.2d 606 (9th Cir.1990) (summary judgment inappropriate where plaintiff presented affidavits from naval architect and marine engineer indicating that unguarded ladder opening was unsafe, photographs showing precautions on other vessels, and OSHA standards requiring covering or rails to protect workers on deck).

██ Under the LHWCA, a person injured by the negligence of a vessel may bring an action against the vessel. 33 U.S.C. § 905(b). However, the liability of a vessel "shall not be based upon the warranty of seaworthiness or breach thereof at the time the injury occurred." *Id.* A claim for negligent design is merely another way of alleging that the ship was unseaworthy. *Bilderbeck v. World Wide Shipping Agy.*, 776 F.2d 817 (9th Cir.1985) (claim that design and modification of vessel rendered vessel dangerous to persons working aboard were generalized conclusions of causation amounting to mere unseaworthiness claim).

Davis' claim that the United States provided him with an unsafe workplace by modifying the BELLATRIX to include raised sills must fail in light of applicable case law. *See Treadaway v. Societe Anonyme Louis–Dreyfus*, 894 F.2d 161 (5th Cir.1990) (jury verdict for plaintiff upheld based on presence of oil in tally room; court specifically disavowed reliance on claim that placement of a pipe caused the accident since placement was a design defect); *Salvato v. Hakko Maritime Corp.*, 718 F.Supp. 1443 (N.D.Cal.1989) (allegations that defendant negligently placed lashing padeyes on car carrier amounted to a design defect not actionable under the LHWCA); *McSwiggan v. Oulu Shipping Ltd.*, 1992 A.M.C. 1825, 1992 WL 70416 (E.D.Pa.1992) (plaintiff's claim that existence of a recessed ladder is a design defect rendering the ship unseaworthy is not available under the LHWCA); *Matthews v. Lykes Bros. S.S. Co., Inc.*, 1987 A.M.C. 1707, 1987 WL 16506 (C.D.Cal.1987) (no products liability claim against ship owner available from allegations that ship's ramps were defectively designed, constructed, or had insufficient warnings). Accordingly, summary judgment is appropriate on Davis' claim that the BELLATRIX' design resulted in his injury.

### CONCLUSION

This Court has no doubt that Davis sustained disabling and life-altering injuries in the accident aboard the BELLATRIX. Nonetheless, his claims against the United States cannot survive summary judgment.

First, the United States owed no duty to Davis with regard to the forklift's brakes. SEACO owned the forklift, the United States was not involved in cargo operations, and the lack of knowledge about the brake problems rendered the United States' duty to intervene inapplicable. Given this lack of duty, summary judgment for the United States is appropriate.

Second, Davis' evidence on the steepness of the ramp indicated only that the ramp was the steepest one that he had seen. Although Davis testified at his deposition that the brakes would not hold because the ramp was so steep, he apparently abandoned this theory at summary judgment. His response discusses only the possibility that the brakes failed to hold or that the forklift collected too much speed for whatever reason. Even if Davis did not abandon his ramp theory, the steepness of the ramp is a design defect not actionable under the LHWCA.

Finally, Davis' accident was due to a combination of the failing brakes and the raised sill at the bottom of the ledge. This combination did not occur until after the United States had turned over the BELLATRIX for cargo operations, and the accident itself would not have occurred had the brakes not failed. Davis presented no evidence that the design of the raised sill was hazardous so that the stevedore in the exercise of reasonable caution could not have safely carried on cargo operations. Additionally, the claim that the United States' design of the BELLATRIX resulted in plaintiff's harm is merely an unseaworthiness claim, which was eliminated from the LHWCA in the 1972 amendment. Accordingly,

**IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment be and is granted.